# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Case No.  5:25-mj-00570-DUTY |
| RODOLFO ANTHONY RUANO, | |
| Defendant. | |

**FILED**
CLERK, U.S. DISTRICT COURT
09/11/2025
CENTRAL DISTRICT OF CALIFORNIA
BY: ____ram____ DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief. On or about the date of September 9, 2025, in the county of San Bernardino in the Central District of California, the defendant violated:

*Code Section:*
8 U.S.C. §§ 1324(a)(1)(A)(ii)

*Offense Description:*
Transportation of Illegal Alien

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
Complainant's signature

Harvey Nunez, Border Patrol Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  9/11/2025  at 8:32 a.m.

Judge's signature

City and state:  Riverside, California

Honorable David T. Bristow, U.S. Magistrate Judge
*Printed name and title*

AUSA: Sonah Lee (951-276-6924)

**AFFIDAVIT**

I, Harvey Nunez, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against Rudolfo Anthony RUANO ("RUANO") for a violation of Title 8, United States Code, Section 1324(a)(1)(A)(ii) (Transportation of an Illegal Alien).

2. This affidavit is also made pursuant to 18 U.S.C. § 3144 and in support of the government's motion for designation of one material witness, identified below, in connection with the criminal complaint sought herein against RUANO.

3. I was not involved in the arrest of RUANO, his Mirandized interview, or the interview of the material witness. The facts set forth in this affidavit are based on my training and experience, and information obtained from various law enforcement personnel and witnesses, including my review of reports prepared by other law enforcement officers and agents. This affidavit is intended to show that there is sufficient probable cause for the requested complaint, and that there are sufficient facts to establish that the testimony of the proposed material witness is material in a criminal proceeding and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

4.  I am a United States Border Patrol Agent ("BPA") with the Department of Homeland Security ("DHS"), Customs and Border Protection ("CBP"), United States Border Patrol ("USBP"). I have been employed as a full-time, sworn federal BPA with the USBP since August 6, 2007, and graduated from the USBP Basic Border Patrol Training Academy located in Artesia, New Mexico. The Academy curriculum covers specialized training in the Immigration and Naturalization Act, criminal law, and statutory authority, as well as cross-training in Title 21, United States Code, Controlled Substances law, and in Title 19, United States Code, Customs law.

5.  During the course of my employment with USBP, I participated in alien smuggling investigations that have resulted in federal criminal charges. In connection with that work, I have made arrests, prepared reports on federal proceedings, and provided sworn statements in federal criminal proceedings. My work also has included speaking with suspects, cooperating witnesses, and other law enforcement personnel regarding the different methods by which the crime of alien smuggling is committed.

6.  Through my experience, I have gained a working knowledge and insight into the typical workings of criminal alien smuggling organizations. I also have gained extensive information regarding the normal operational habits of people who make their living as alien smugglers, including the behavior, speech, routes, and methods of operation of alien

smugglers to avoid detection and apprehension by law enforcement officers.

### III. STATEMENT OF PROBABLE CAUSE

7. Based on my review of one or more incident reports, conversations with other law enforcement agents, and information contained in DHS databases, I am aware of the following:

**A.   Traffic Stop and Initial Investigation**

8. On September 9, 2025, BPAs from the Indio Station Disrupt Team were working the Interstate 40 (I-40) corridor near Barstow, California. The I-40 corridor is a primary circumvention route for Interstate 10, which bypasses USBP checkpoints. Based on my training and experience, Transnational Criminal Organizations ("TCOs") who are involved in alien and narcotics smuggling utilize the I-40 corridor in an effort to avoid USBP inspection checkpoints.

9. On September 9, 2025, Indio Disrupt Team agents were driving marked and unmarked USBP service vehicles equipped with emergency lights and sirens. Unmarked vehicles utilized displayed characteristics of a law enforcement vehicle, including a service radio antenna and a caged detention area. All agents were wearing USBP rough duty uniforms with full agency identifiers displayed.

10. Before 9:00 a.m. on September 9, 2025, BPAs Kim and Raymer were positioned in their vehicle on westbound I-40 in the center median underpass of the Newberry Springs bridge near Newberry Springs, California. At this time, traffic flow in

this area was comprised of travelers and commercial vehicles heading towards Los Angeles.

11. At approximately 9:00 a.m., SBPA Kim and BPA Raymer observed a grey Nissan Altima pass their location. The vehicle was traveling in the fast lane (i.e. the far left or the fast lane) by itself with no vehicles beside it or in front of it. BPAs Kim and Raymer observed the Nissan with lightly tinted windows and a large blanket like material hanging down from the rear interior area of the vehicle which was visibly flapping through the silhouette of the sunlight. The cloth like blanket in the rear of the vehicle appeared to be concealing the occupants inside. The vehicle was also bearing a Texas license plate, which according to SBPA Kim and BPA Raymer, is less common along this stretch of I-40 than Arizona and California license plates. SBPA Kim and BPA Raymer merged onto the interstate to investigate the Nissan and to conduct record checks on the license plate.

12. SBPA Kim and BPA Raymer positioned their service vehicle behind the Nissan and conducted a records check on the Texas license plate through a government-issued laptop with access to law enforcement databases. Record checks revealed the Nissan was registered out of Fort Worth, Texas and that the registered owner, Rodolfo Anthony RUANO, had an active arrest warrant from Texas.

13. While BPAs were conducting the records check, the Nissan slowed down from 80 miles per hour ("mph") to 50 mph, while the posted speed limit is 70 mph. This drastic decrease

in driving speed raised suspicion, as it indicated the driver was aware of law enforcement presence.

14. As the Nissan continued to travel westbound on I-40, the driver positioned the Nissan behind a semi-truck and slowed down to 45 mph in the number two lane (i.e. the right or slow lane). No other vehicles were traveling in the number one lane.

15. BPAs Kim and Raymer then drove parallel to the Nissan and saw that the driver was not looking over and appearing nervous. According to SBPA Kim and BPA Raymer, the driver did not look over at the agents and he appeared nervous. SBPA Kim and BPA Raymer also reported that the driver and the front-seat passenger who were both avoiding eye contact.

16. SBPA Kim and BPA Raymer relayed to the other BPAs requesting a marked vehicle to conduct a vehicle stop based on the aforementioned observations and the Warrant of Arrest for the registered owner, but all marked units were too far away from the traveling Nissan. BPA Lozano was able to catch up and position himself in another unmarked vehicle behind SBPA Kim and BPA Raymer for Officer Safety. SBPA Kim and BPA Raymer activated their emergency lights and sirens and conducted a vehicle stop near the Hidden Springs Road exit, and the Nissan pulled over without incident.

17. SBPA Kim and BPA Raymer approached the Nissan and located two occupants, the driver who was identified as RUANO and the front-seat passenger who was later identified as Eduardo Tsah-Tum ("TSAH").

18. SBPA Kim, BPAs Raymer and Lozano interviewed RUANO and TSAH as to their citizenship and purpose of travel and learned the following:

   a. RUANO stated that he was a United States citizen.

   b. TSAH stated that he was a citizen of Guatemala without immigration documents or authorization to enter the United States.

   c. RUANO, who appeared nervous and visibly shaking, presented a Texas Driver's license that was cut on the top right corner, signifying that it was invalid. RUANO stated that he knew the passenger TSAH was an illegal alien and that he was transporting TSAH from Texas to Los Angeles, California for a payment of $500 USD.

19. Both RUANO and TSAH were transported to the Indio U.S Border Patrol Station for further interview and processing. At the Indio Border Patrol Station, records checks revealed that RUANO has a non-extraditable warrant out of Texas.

20. TSAH's fingerprints were entered into the Biometrics IDENT IAFIS database, which revealed that he has no criminal convictions but had been previously apprehended by USBP and had been removed via Phoenix, Arizona.

### B. MATERIAL WITNESS RECORDED INTERVIEW

21. During a recorded sworn statement, after he was advised of his Miranda rights, TSAH stated that his complete and correct name is Eduardo TSAH-Tum. TSAH was born on September 21, 2001, in Guatemala, and he is a citizen of Guatemala. TSAH

said that he re-entered the United States to reunite with family and work in Los Angeles, California.  TSAH stated he is not in possession of a document that would allow him to enter, work or remain in the United States.

    22.  TSAH stated he made smuggling arrangements with an individual by the name of "El Chaparro" in Guatemala and that he was charged approximately 130.000 Quetzales (approx. 17,000 USD.)  After making arrangements to be smuggled into the United States, TSAH traveled to Ciudad Juarez, Chihuahua, Mexico. While in Ciudad Juarez TSAH explained he was at a warehouse with three others waiting to be smuggled into the United States.

    23.  TSAH stated that he and two other smuggled aliens from Mexico were guided to an area he described as an underground concrete tunnel.  TSAH said that he and the other aliens had to crawl in the tunnel for approximately thirty minutes before the group reached the interior of the United States.

    24.  TSAH stated they waited north of the tunnel for a few hours before they were subsequently transported to a warehouse in El Paso, Texas, where he observed twelve other illegal aliens being housed pending further transportation into the U.S. interior in furtherance to their illegal entry.

    25.  TSAH stated all twelve subjects including TSAH were later instructed to board a white semi-truck, and traveled for several hours.  TSAH stated that the semi-truck landed at an unknown location, in a public area.  At this location, TSAH stated he was turned over to the driver that he later identified

as RUANO and was instructed to enter the dark vehicle he was later found in by BPAs.

26. TSAH stated he traveled in the vehicle with RUANO for several hours before being arrested by USBP. When asked, TSAH said that he had not met RUANO before before their travel, that his communications with RUANO were limited, and that RUANO told him that the travel was safe and that they were almost to their destination.

27. TSAH stated that RUANO was fully aware that TSAH was illegally present in the United States and RUANO was working for the alien smuggling organization.

28. At approximately 2:00 p.m., TSAH was presented with a photographic lineup of six individuals. TSAH positively identified the person assigned photograph number five as the smuggler that transported him from Texas to California. Picture number five depicts defendant Rodolfo RUANO.

### C.  DEFENDANT'S RECORDED INTERVIEW

29. RUANO was read his Miranda rights and agreed to speak with agents. During this post-Miranda interview, RUANO stated that he was born in Stamford, Connecticut, but left for Guatemala with his parents when he was only 8 months old. RUANO stated that he came back to the United States when he was 14 years old to live with his uncle and aunt in the Bronx. RUANO stated when he was 17 years old, he was having issues with his aunt who sent him back to Guatemala. RUANO stated as soon as he turned 18 years old, he returned to the United States and has

been living in Fort Worth, Texas. RUANO also stated he is currently unemployed.

30. RUANO stated that due to his unemployment, he accepted an offer from an ex-coworker to transport one subject from Texas to California.

    a. RUANO stated his payment was going to be $500 USD. RUANO stated the subject who coordinated the alien smuggling incident is an individual named either MAURICIO or STEVEN.

    b. RUANO claimed not to be certain of the organizer's name and only provided his cellphone number. RUANO stated he was in contact with him through WhatsApp.

    c. RUANO stated that MAURICIO or STEVEN texted him on September 8, 2025, with the location of the pickup in a trailer park in Fort Worth, Texas.

    d. RUANO stated that TSAH was waiting for him near the entrance of the trailer park. RUANO was asked if he knew TSAH was present in the United States illegally and RUANO stated that he did not know or bother to ask the immigration status of TSAH.

31. RUANO stated that he was in communication with TSAH's family members who were going to receive him in Los Angeles, California.

## IV. CONCLUSION

32. For all the reasons described above, there is probable cause to believe that RUANO has committed a violation of 8 U.S.C. § 1324(a)(1)(A)(ii) (Transportation of Illegal Aliens).

33. Finally, for all the reasons described above, there is sufficient facts to establish that the testimony of TSAH is material in a criminal proceeding, and that TSAH should be designated and detained as material witness pursuant to 18 U.S.C. § 3144 (release or detention of a material witness).

Attested to by the applicant
in accordance with the
requirements of Fed. R. Crim.
P. 4.1 by telephone on this
 11th  day of September 2025.

_____
HONORABLE DAVID T. BRISTOW
UNITED STATES MAGISTRATE JUDGE